10-4596-cv
Levitt v. J.P. Morgan Securities, Inc.

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2011

(Argued: December 12, 2011          Decided: March 15, 2013)

No. 10-4596-cv

—————————————————————

ROBERT LEVITT, for himself and as custodian for RICHARD LEVITT and MONICA LEVITT, STEPHEN G. SIBEN, PHILIP C. VITANZA, for himself, ELIZABETH VITANZA, and LUKE VITANZA, JOHN T. WHITE, as Trustee, GUY V. WOOD, as Trustee, TED M. JONES, as Trustee, KATHRYN N. JONES, as Trustee, *Plaintiffs-Appellee*s,

ROBERT RICE, STEPHEN STROBEHN, STANLEY VELTKAMP, CARL ZANDER, JR., *Plaintiffs,*

-v.-

J.P. MORGAN SECURITIES, INC., J.P. MORGAN CLEARING CORP., *Defendants–Third-Party-Plaintiffs–Cross-Defendants-Appellants.*

—————————————————————

Before:     POOLER, LIVINGSTON, and CARNEY, *Circuit Judges*.

Defendants–Third-Party-Plaintiffs–Cross-Defendants-Appellants J.P. Morgan Securities, Inc. and J.P. Morgan Clearing Corporation (referred to herein collectively as "Bear Stearns"), pursue this interlocutory appeal from a June 24, 2010, decision and order of the United States District Court for the Eastern District of New York (Spatt, *J.*), granting in part and denying in part Plaintiffs-Appellees' motion for class certification pursuant to Fed. R. Civ. P. 23(b)(3). On appeal, Bear Stearns argues that the district court erred in certifying a plaintiff class claiming violations of § 10(b) of the Securities Exchange Act of 1934 because, as a clearing firm engaged in mere clearing conduct, Bear Stearns owed no fiduciary duty to Plaintiffs-Appellees, who are customers of the introducing broker-dealer, to disclose that broker-dealer's

scheme to manipulate an initial public offering. Because it owed no duty of disclosure, Bear Stearns argues, the district court erred in applying a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and, absent such a presumption, the class fails to satisfy the predominance requirement of Rule 23(b)(3). We agree that the proposed class fails the predominance requirement of Rule 23(b)(3) and **REVERSE** the order of the district court.

KERRY A. DZIUBEK (Michael D. Schissel and Mark A. Kleyna, *on the brief*), Arnold & Porter LLP, New York, NY, *for Defendants–Third-Party-Plaintiffs–Cross-Defendants-Appellant*s.

LESLIE TRAGER, New York, NY, *for Plaintiffs-Appellee*s.

LIVINGSTON, *Circuit Judge*:

Defendants–Third-Party-Plaintiffs–Cross-Defendants-Appellants J.P. Morgan Securities, Inc. and J.P. Morgan Clearing Corporation (referred to herein collectively as "Bear Stearns"[1]), pursue this interlocutory appeal from a June 24, 2010, decision and order of the United States District Court for the Eastern District of New York (Spatt, *J*.), granting in part and denying in part Plaintiffs-Appellees' motion for certification of a class pursuant to Fed. R. Civ. P. 23(b)(3). The Plaintiffs-Appellees (the "Levitt Plaintiffs" or "Plaintiffs") are

---

[1] At all times relevant here, Bear Stearns Securities Corporation ("Bear Stearns") acted as the clearing agent for broker Sterling Foster & Company, Inc. On October 1, 2008, Bear Stearns and its parent corporation Bear, Stearns & Company Inc. were acquired by the Defendants–Third-Party-Plaintiffs–Cross-Defendants-Appellants J.P. Morgan Securities, Inc. and J.P. Morgan Clearing Corporation.

former customers of the New York broker-dealer Sterling Foster & Company, Inc. ("Sterling Foster"), for which Bear Stearns, as a clearing broker, performed certain settlement and record-keeping functions. The Levitt Plaintiffs allege that Bear Stearns violated § 10(b) of the Securities Exchange Act of 1934 by participating in Sterling Foster's market manipulation scheme. The district court concluded that the Plaintiffs' allegations satisfied Rule 23(b)(3)'s predominance requirement and granted class certification for violations of § 10(b).

On appeal, Bear Stearns argues principally that, as a clearing broker engaged in mere clearing conduct, it owed no fiduciary duty of disclosure to the Levitt Plaintiffs, who were customers of Sterling Foster, and that the district court erred in finding that Bear Stearns participated in Sterling Foster's market manipulation scheme to such an extent as to trigger a duty of disclosure to the Levitt Plaintiffs. Accordingly, Bear Stearns contends, the district court erred in finding that the Levitt Plaintiffs could rely upon a class-wide presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and in therefore holding that the putative class could satisfy the predominance requirement of Rule 23(b)(3).

For the reasons stated below, we conclude that the Levitt Plaintiffs' allegations—principally that Bear Stearns participated in Sterling Foster's

fraudulent conduct by, among other things, continuing to clear transactions for Sterling Foster despite alleged knowledge of the ongoing manipulative scheme and by failing to cancel unpaid trades in violation of Federal Reserve Board Regulation T—fail to trigger a duty of disclosure to Sterling Foster's clients such that the *Affiliated Ute* presumption of reliance applies. The Levitt Plaintiffs therefore fail to satisfy Rule 23(b)(3)'s predominance requirement. Accordingly, we reverse the decision of the district court certifying a class.[2]

## BACKGROUND

*I.    Factual Background*

1.    The Role of Clearing Brokers

Approximately ninety percent of the broker-dealers registered with the Securities and Exchange Commission ("SEC") hire a clearing broker to perform the back-office services associated with securities trading. *See* Henry F. Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917, 917 (2003) (*"Clearing Arrangements"*). "Major clearing firms . . . handle millions of trades daily on behalf of customers of hundreds of [broker-dealers]." J.A. 973 (Expert Affidavit of Henry F. Minnerop). A clearing broker's involvement in any given transaction

---

[2] Bear Stearns also argues that the district court misapplied the preponderance of the evidence standard in deciding the motion for class certification and ignored testimony of the lead plaintiffs which demonstrated that they failed to satisfy the typicality requirement of Rule 23(a). In light of our disposition of the case, we do not address these arguments.

4

typically begins after the execution of a trade, when "the clearing firm processes, settles, and clears the transaction and prepares an appropriate trade confirmation" to send to the customer. *Clearing Arrangements* at 923-24. "The clearing firm . . . maintains custody of the customer's securities and funds upon receipt, and may provide margin financing if the introduced customer has signed a margin agreement with the clearing firm." *Id*. at 924. The broker-dealer typically retains all customer-contact functions, including soliciting customers, recommending the purchase or sale of securities to customers, and monitoring customers' transactions. Under the most common form of agreement between clearing brokers and introducing firms, known as a "fully disclosed" agreement, "the introducing firm discloses the identity of each of its customers to its clearing firm. The clearing firm then establishes on its books and records an account in the name of each introduced customer and 'carries' that account with its own net capital." *Id*. at 920. "Under these circumstances, the clearing firm's primary (and frequently only) source of information about the customer is the introducing firm." *In re Bear, Stearns Secs. Corp.*, Exchange Act Release No. 7718, 1999 WL 569554, at *5 (Aug. 5, 1999).

Broker-dealers employing the services of a clearing broker are known as "introducing firms," to distinguish them from "self-clearing" broker-dealers, which perform all of the functions of a clearing broker internally. Contracting

out for clearance and settlement services relieves introducing firms of the "huge costs associated with [these] 'back-office' operations." *Dillon v. Militano*, 731 F. Supp. 634, 636 (S.D.N.Y. 1990).

At all times relevant to the parties here, New York Stock Exchange ("NYSE") Rule 382 permitted clearing brokers contractually to allocate all "know your customer" responsibilities—including "opening, approving and monitoring of accounts [and] safeguarding of funds and securities"—to the introducing firm.[3]  J.A. 968-69 (Minnerop Aff.).  Rule 382, as amended, thus

---

[3]  New York Stock Exchange Rule 382 was adopted in 1968 and underwent several amendments in 1975, 1982, 1999, and 2001.  *See* New York Stock Exchange ("NYSE") Rule 382, *New York Stock Exchange, Inc. General Rules* (Wolters Kluwer Financial Services) ¶ 2382, at 3639-40 (2010).  The Financial Industry Regulatory Authority (FINRA) recently adopted Rule 4311 governing carrying agreements, which closely incorporates and replaces NYSE Rule 382 and NASD Rule 3230.  *See* FINRA, Regulatory Notice 11-26, *Financial Responsibility: SEC Approves Consolidated Financial Responsibility and Related Operational Rules* (2011).  The transactions at issue in the instant case are governed by NYSE Rule 382 under the post-1982 amendments, and this opinion references the Rule's text as it applied to the parties at the time.

As relevant here, Rule 382(b) provided

[e]ach agreement in which accounts are to be carried on a fully disclosed basis shall specifically identify and allocate the respective functions and responsibilities of the introducing and carrying organizations, which agreement shall, at a minimum, address each of the following functions:
    (1) opening, approving and monitoring of accounts
    (2) extension of credit
    (3) maintenance of books and records
    (4) receipt and delivery of funds and securities
    (5) safeguarding of funds and securities
    (6) confirmations and statements
    (7) acceptance of orders and executions of transactions.

NYSE Rule 382(b).

"relieved clearing firms from their prior regulatory duty under NYSE Rule 405 to supervise introducing firms, including their sales activities." *Clearing Arrangements* at 935; *see also Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 425 (S.D.N.Y. 2008) ("Pursuant to the rules of the [SEC], the clearing broker does not supervise—and is not responsible for—the sales practices of the introducing broker. The introducing broker is responsible for its own sales practices, and responsibility cannot be transferred to or imposed upon the clearing broker."). Rule 382 thereby "encourag[ed] minimally-capitalized brokerage firms to place investor assets into the custody of well-capitalized clearing firms that possess[] the operational capacity to process and clear transactions promptly and accurately and maintain timely and accurate brokerage records." *Clearing Arrangements* at 936.

2. Sterling Foster and the ML Direct IPO

Sterling Foster was established as a broker-dealer in 1994; it retained Bear Stearns to serve as its clearing broker pursuant to an agreement dated April 14, 1994 (the "Agreement"). The Agreement provided that Sterling Foster would be

solely responsible for the conduct of the [customer accounts, or "Accounts"], and ensuring that the transactions conducted therein are in compliance with the Applicable Rules. Such responsibility includes, but is not limited to: (i) using due diligence to learn and on a continuing basis to know the essential

7

facts of each Customer . . .; (ii) selecting, investigating, training, and supervising all personnel who open, approve or authorize transactions in the Accounts; (iii) establishing written procedures for the conduct of the Accounts and ongoing review of all transactions in Accounts, and maintaining compliance and supervisory personnel adequate to implement such procedures; (iv) determining the suitability of all transactions, including option transactions; (v) ensuring that there is a reasonable basis for all recommendations made to Customers; (vi) determining the appropriateness of the frequency of trading in Accounts; (vii) determining the authorization and legality of each transaction in the Account; and (viii) obtaining and maintaining all documents necessary for the performance of [Sterling Foster's] responsibilities under this Agreement and retaining such documents in accordance with all the Applicable Rules.

Bear Stearns issued a so-called "Rule 382 Notice" to Sterling Foster's customers; such notices "inform[ed] . . . customers that their brokerage firm had entered into a clearing agreement with a specified clearing firm [here Bear Stearns]," J.A. 959 n.13 (Minnerop Aff.), and "provide[d] a summary of the allocation of functions and responsibilities between the introducing and clearing firm as set forth in their clearing agreement," *id.*[4] Here, the Rule 382 Notice advised Sterling Foster's customers that "your brokerage firm [Sterling Foster] shall at all times be exclusively responsible for . . . . [t]he conduct of your account and ensuring that transactions effected therein are in compliance with all

---

[4] Rule 382 required at the relevant time that "[e]ach customer whose account is introduced on a fully disclosed basis shall be notified in writing upon the opening of his account of the existence of the agreement and of the relationship between the introducing and carrying firm." NYSE Rule 382(c).

applicable law and rules." The Rule 382 Notice further provided that Bear Stearns would "be responsible for . . . [a]ny extensions of credit to [the customer], which includes complying with Regulation T of the Federal Reserve Board determining maintenance margin, paying and charging interest and rehypothecation or loan of any of your margin securities."

In the two years following Sterling Foster's establishment in 1994, the firm underwrote five initial public offerings ("IPOs") for which Bear Stearns served as clearing broker. In each of these offerings, Sterling Foster engaged in stock-manipulation maneuvers whereby it entered into secret agreements with inside shareholders which resulted in substantial profits for Sterling Foster. Under standard "lock-up agreements" with inside shareholders—investors affiliated with the issuing corporation, such as the corporation's founders and inside consultants—these shareholders were prevented from selling their shares for a certain period of time following the IPO, unless the shares were released for sale earlier with the permission of the underwriter, Sterling Foster. The prospectuses for the five offerings represented that Sterling Foster had no prearranged agreements with the inside shareholders to release them from their lock-up agreements. In fact, and unbeknownst to the buying public, Sterling Foster had already entered into agreements with the inside shareholders to purchase their shares at a price substantially below the prevailing market price

at the time of the IPO.  Then, on the first days of trading in the IPO, Sterling Foster would "use aggressive sales tactics that created a large demand for the offerings" and would "sell shares far in excess of what was being offered, . . . . creat[ing] a significant short position for Sterling Foster in these securities." J.A. 578 (Transcript of Plea Allocution of Adam Lieberman (S.D.N.Y. Mar. 4, 1998)).  Sterling Foster covered its large short position by releasing the inside shareholders from their lock-up agreements and purchasing their shares at below-market prices, resulting in a substantial profit to Sterling Foster of the difference between the prevailing market price and the price paid to the inside shareholders.  *Id.*

The Levitt Plaintiffs are former customers of Sterling Foster who purchased securities in the September 4, 1996 IPO of ML Direct, Inc. ("ML Direct"). Although the ML Direct IPO was nominally underwritten by Patterson Travis, Inc. ("Patterson"), and not by Sterling Foster, Sterling Foster was able to engage in a market manipulation scheme similar to that described above.

The ML Direct prospectus (the "Prospectus"), dated August 2, 1996, announced that ML Direct would be offering 480,000 units in its IPO.  Each unit consisted of two shares of common stock and one purchase warrant and would be offered at an initial price of $15.00 per unit.  In total, approximately 1.1 million common shares of ML Direct would be issued in the IPO.  In addition to

the public offering, the Prospectus disclosed that ML Direct would also be seeking registration from the SEC for a so-called "shelf offering," which would cover the sale of 2.4 million shares and 2 million warrants that were owned by certain shareholders affiliated with ML Direct (hereinafter the "Selling Securityholders"). The Prospectus disclosed the existence of a standard lock-up agreement with the Selling Securityholders which restricted their ability to sell their shares of ML Direct directly following the commencement of the IPO:

> The securities held by the Selling Securityholders may be sold commencing 12 months from the date of this Prospectus, subject to earlier release at the sole discretion of Patterson Travis, Inc., the representative (the "Representative") of the underwriters of this offering . . . . The Representative has no agreements or understandings with any of the Selling Securityholders with respect to release of the securities prior to the respective periods and has no present intention of releasing any or all of such securities prior to such periods.

Although the Prospectus stated that Patterson had no existing agreement with the Selling Securityholders to release them from their 12-month lock-up agreement, and no present intention of entering into such an agreement, in fact, Sterling Foster had already caused Patterson to enter into a secret agreement with the Selling Securityholders to sell their shares to Sterling Foster once the IPO was underway.

When trading commenced on September 4, 1996, Sterling Foster purchased nearly all of the 1.1 million shares of ML Direct common stock being

11

offered to the public. But it also sold more than three and a half times the number of shares registered in the IPO, for a total of 3.9 million shares of ML Direct. This resulted in a substantial short position of 2.86 million shares of ML Direct at the end of the first day of trading.

Sterling Foster would have had to pay more than $43.69 million to cover this short position at the prevailing market price of $15.25 per share. But instead of covering its short position of 2.86 million shares by purchasing shares of ML Direct in the market, Sterling Foster caused Patterson to release the Selling Securityholders from the lock-up agreement on September 10. Sterling Foster then purchased the shares of the Selling Securityholders at a price of $3.25 per share, substantially below the prevailing market price of $15.25 to $15.50 per share, resulting in more than a 400% profit to Sterling Foster.

3.      The Role of Bear Stearns in the ML Direct IPO

According to the Levitt Plaintiffs, in August 1996, prior to the first day of trading on September 4, Sterling Foster's president, Adam Lieberman ("Lieberman"), informed Keith Brigley ("Brigley"), an associate director in Bear Stearns' clearing division, that Sterling Foster intended to create a large short position in ML Direct stock on the first day of trading. Lieberman indicated to Brigley that the short position would be significantly larger than short positions that Sterling Foster had taken in previous IPOs, but assured Brigley that

12

Sterling Foster would cover the short position by purchasing shares of the Selling Securityholders, which Patterson had agreed to release and which Sterling Foster had arranged with the Selling Securityholders to purchase. Bear Stearns had previously received a copy of the Prospectus which stated that Patterson had no present intention of releasing the shares of the Selling Securityholders before the 12-month lock-up period had expired.

After learning of Sterling Foster's plans for the ML Direct IPO, Bear Stearns required Lieberman to sign a personal guarantee (the "Guarantee"). On August 21, Brigley faxed Lieberman a copy of the Guarantee; on the cover letter, he wrote, "[w]e need these items to be addressed now. There is no approval for you to proceed with the deal at Bear until the above items are addressed. Please call ASAP." Brigley testified that the reason for the Guarantee was because "[t]he dollar amount [of the ML Direct offering] was getting huge." (Internal quotation marks omitted). The Guarantee provided that Lieberman

> unconditionally and personally guarantees to [Bear Stearns] . . . the prompt payment when due of all liabilities, debts, obligations, and expenses . . . arising out of or incurred in connection with [Bear Stearns] providing securities clearance services . . . in connection with the clearance and settlement by [Bear Stearns] of the following: (i) all transactions in an initial public offering of 480,000 units of [ML Direct] to be offered on or about August 22, 1996 . . . at a price of approximately $15.00 per unit and with respect to which [Sterling Foster's] retention as a member of the [ML Direct] syndicate is approximately 192,000 units and, (ii) all transactions in [ML Direct] executed in the secondary market . . . .

Brigley's cover letter also noted a "need to have more collateral on hand."

13

From September 4, the first day of trading in the ML Direct IPO, through September 11, Bear Stearns carried Sterling Foster's large short position of 2.86 million ML Direct shares on its books. The Levitt Plaintiffs allege that although the provisions of Federal Reserve Board Regulation T required Bear Stearns to cancel customer trades that remained unpaid two days after the settlement date (or submit extension requests to the NYSE), Bear Stearns failed to cancel unpaid trades made on September 4. By the close of business on September 12, Sterling Foster customers owed more than $13.8 million for purchases of ML Direct shares made on September 4. Ultimately, Bear Stearns canceled nearly one-fourth of the purchases by Sterling Foster customers made on that day.

On September 11, the Selling Securityholders delivered their shares, which Sterling Foster had agreed to purchase at the below-market price of $3.25 per share, to Bear Stearns. Bear Stearns issued checks to the Selling Securityholders on September 12.

The trade confirmations that Bear Stearns sent to Sterling Foster's customers, reflecting their purchases of ML Direct stock in the IPO, stated, "[y]our broker makes a mkt [market] in this security, and acted as principal."

Finally, Bear Stearns records reveal a number of customer purchases recorded "as of" September 4. Typically the designation "as of" is used when a trade is corrected after the date on which it was originally entered into. Here,

14

however, Sterling Foster employed the designation "as of" even though the trades had never been entered into on the "as of" date, but instead were executed much later. In fact, some of the "as of" trades recorded by Sterling Foster were recorded on behalf of customers who had opened their accounts with Sterling Foster after September 4, thus making it impossible that the trade was originally executed on this date. Designating the trades "as of" allowed Sterling Foster to record trades at the higher September 4 market prices, rather than the actual market prices prevailing at the time of the trade.

## II. Procedural History

The procedural history leading to the present appeal is extended and complex; the proceedings specifically relevant to the present appeal, however, are straightforward. Purchasers of securities in the IPOs underwritten by Sterling Foster brought suit for securities fraud in various district courts across the country. These suits were consolidated and a group of plaintiffs known as the "Rogers Plaintiffs" were appointed lead plaintiffs. In February 1998, the Judicial Panel on Multidistrict Litigation transferred the consolidated cases against Sterling Foster to the United States District Court for the Eastern District of New York (Spatt, *J.*). After the transfer, the Rogers Plaintiffs amended their complaint to add Bear Stearns as a defendant.

In February 1999, the Levitt Plaintiffs brought suit against Bear Stearns in the United States District Court for the Southern District of New York. *See Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 100 (2d Cir. 2003) ("*Levitt I*"). They alleged federal causes of action for securities fraud and a state-law cause of action for common-law fraud in connection with the ML Direct IPO. *Id*. at 100-01. The action was transferred to the United States District Court for the Eastern District of New York (Spatt, *J*.) in April 1999 as a tag-along to the consolidated class action suit against Sterling Foster by the Rogers Plaintiffs. *Id*. at 101.

Eventually, after considerable procedural back-and-forth not material here, the district court granted the Levitt Plaintiffs' motion to be appointed lead plaintiffs for the ML Direct class (the Rogers Plaintiffs having since settled). *See In re Sterling Foster & Co, Inc., Sec. Litig.*, MDL Docket No. 1208 (ADS), 2008 WL 399296 (E.D.N.Y. Feb. 12, 2008). On September 25, 2009, the Levitt Plaintiffs filed an amended class action complaint (the "Complaint") against Bear Stearns on behalf of a class of "all persons who purchased ML Direct common stock or warrants during the period September 4, 1996 through February 18, 1997, and who lost money on such purchases." The Complaint alleged that Bear Stearns had knowledge of Sterling Foster's plan to manipulate

16

the market for ML Direct stock prior to the commencement of the IPO and that Bear Stearns,

> knowing of the fraud, joined in, permitted and facilitated said fraud and market manipulation by:
>
> > (a) Giving Sterling Foster permission to do the underwriting and agreeing to act as clearing agent for said underwriting.
> >
> > (b) Extending credit to Sterling Foster during the period that Sterling Foster's trading account and overall accounts were in a short position including a margin call for over $23 million which call was never met prior to the delivery of the shares from the selling shareholders, thereby making Bear Stearns, in effect, an unsecured creditor of Sterling Foster for over $23 million during that period of time.
> >
> > (c) Sending out false confirmations to purchasers of ML Direct stating that Sterling Foster with respect to these transactions was acting as a principal and making a market in ML Direct thereby implying that the purchase was a market transaction rather than, as Bear Stearns knew, disclosing that the purchasers had purchased at an underwriting in which Sterling Foster was making a profit of over 400%.

The Complaint asserted four causes of action against Bear Stearns. These were: (1) participation in a fraudulent scheme, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); (2) knowingly making false statements to purchasers of ML Direct securities in trade confirmations, also in violation of § 10(b); (3) control person liability under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a); and (4) common-law fraud.

17

On December 31, 2009, the Levitt Plaintiffs moved for certification of the class "with respect to claims of the class under the Securities Exchange Act, Section 10b and Section 20 and the rules issued thereunder" pursuant to Fed. R. Civ. P. 23(b)(3).[5] In support of their motion for certification, the Levitt Plaintiffs, among other things, submitted the expert report of Robert W. Lowry ("Lowry"); Lowry is the president of RL Consulting Services, a securities consulting firm, and a former accountant with the SEC. In support of their opposition to the Levitt Plaintiffs' motion for class certification, Bear Stearns submitted the expert report of Henry F. Minnerop ("Minnerop"), a senior counsel at Sidley Austin LLP who specializes in representing clearing brokers.

The district court granted certification as to the Levitt Plaintiffs' § 10(b) claims and denied certification on the § 20(a) claim by a June 24, 2010, memorandum decision and order.[6] *Levitt v. J.P. Morgan Secs. Inc.*, 270 F.R.D. 127 (E.D.N.Y. 2010). While acknowledging that "[i]t is well-established that a clearing broker such as Bear Stearns generally owes no duty of disclosure to the clients of introducing brokers," the district court agreed with the Levitt Plaintiffs "that a preponderance of the evidence shows that Bear Stearns participated in

---

[5] The Levitt Plaintiffs did not move for class certification on their common-law fraud claim.

[6] The June 24 opinion was amended by an order of June 30, 2010, which made minor edits to the wording of the Opinion.

18

Sterling Foster's scheme in such a way as to trigger a duty to disclose." *Id*. at 133-34. The district court specifically noted the allegation that Bear Stearns "participated" in Sterling Foster's fraudulent scheme by "granting Sterling Foster permission to underwrite the sale of the insiders' shares even though officers at Bear Stearns knew that Sterling Foster intended to establish a substantial short position and cover that position with insider shares that were subject to the lock-up agreement." *Id*. at 134. The district court also referred to the view of Robert Lowry that Bear Stearns participated by failing to cancel trades, allegedly in violation of Regulation T, which, Lowry said, "was an important component of the scheme because it gave Sterling Foster more time to find buyers to purchase the canceled shares, thus enabling Sterling Foster to maintain an artificial price for ML Direct." *Id*.

Having found that Bear Stearns sufficiently participated in Sterling Foster's market manipulation scheme so as to trigger a duty of disclosure to Sterling Foster's customers, the district court held that the Levitt Plaintiffs were entitled to a presumption of reliance on what it characterized as Bear Stearns' "omission"—its failure to disclose the ML Direct market manipulation scheme to Sterling Foster's customers. *Id*. at 133. Thus, the district court held that the Levitt Plaintiffs' § 10(b) claims satisfied the predominance requirement for certification of a class under Rule 23(b)(3).

19

The district court denied class certification with respect to the Levitt Plaintiffs' claim under § 20(a), holding that the Complaint's allegations "[fell] short of establishing that Bear Stearns controlled Sterling Foster [because] [t]here is simply no indication . . . that Bear Stearns directed Sterling Foster's management and policies, as is required by Section 20(a)." *Id*. at 135.[7]

Bear Stearns moved for leave to pursue an interlocutory appeal of the district court's June 24 opinion, which a panel of this Court granted on November 10, 2010.

## DISCUSSION

We review a district court's grant of class certification for abuse of discretion, *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 250 (2d Cir. 2011), and review the conclusions of law underlying that decision *de novo*, *id*. at 251. We also review for abuse of discretion the district court's finding that the Levitt Plaintiffs satisfied the predominance requirement of Rule 23(b)(3), although "we review for clear error the factual findings underlying th[at] ruling." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). "When reviewing a grant of class certification, we accord the district court noticeably more deference than when we review a denial of

---

[7] The Levitt Plaintiffs do not contest the district court's ruling with respect to the § 20(a) claim on appeal.

class certification." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008).

*I.     Rule 23 Requirements*

A district court may only certify a class if it determines that each Rule 23 requirement is met. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 221 (2d Cir. 2008). Rule 23(a) provides that a class action is appropriate

> only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If the Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b). *See Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010).

The Levitt Plaintiffs sought certification under Rule 23(b)(3), which permits certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b).

"In evaluating a motion for class certification, the district court is required to make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, and must resolve material factual disputes relevant to each Rule 23 requirement." *Brown*, 609 F.3d at 476 (internal quotation marks omitted). "The Rule 23 requirements must be established by at least a preponderance of the evidence." *Id*. The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).

The principal question in this appeal is whether the district court properly determined that the Rule 23(b)(3) predominance requirement was met. This question largely turns on whether Bear Stearns's conduct in its role as a clearing broker was such that Bear Stearns owed (and breached) a duty of disclosure to Sterling Foster's customers.

II.     *The Private Right of Action under § 10(b)*

Section 10(b) makes it unlawful "for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, provides as follows:

22

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ an device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In a typical § 10(b) private action "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). In addition, for an omission to be considered actionable under § 10(b), the defendant must be subject to an underlying duty to disclose. *See Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("To be actionable, . . . a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *In re Time Warner Inc. Secs.*

*Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A]n omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts."). Finally, an omission of a material fact by a defendant with a duty to disclose establishes a rebuttable presumption of reliance upon the omission by investors to whom the duty was owed. *Affiliated Ute*, 406 U.S. at 153-54.

### III.   Duty of a Clearing Broker (Generally)

We have previously said that "a clearing agent[] is generally under no fiduciary duty to the owners of the securities that pass through its hands." *Edwards & Hanly v. Wells Fargo Secs. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979); *see also Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (holding that a clearing broker did not owe a fiduciary duty under New York law to a customer of an introducing broker). Nor does the "simple providing of normal clearing services to a primary broker who is acting in violation of the law . . . make out a case of aiding and abetting against the clearing broker." We made this latter point in *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000), which dealt with claims against Bear Stearns arising out of the very same ML Direct IPO at issue in the present case. There, we affirmed the district court's denial of a petition to vacate an NASD

24

arbitration award that had in turn dismissed securities fraud and state-law claims brought against Bear Stearns by an investor in the IPO. As relevant here, we noted that "there was ample evidence for the arbitrators to conclude that Bear Stearns' participation [in the ML Direct IPO] was insufficient to constitute substantial assistance" under New York aiding and abetting law.[8] *Id.* at 29.

Applying these principles, district courts in this Circuit have distinguished two categories of cases. First, in cases where a clearing broker was simply providing normal clearing services, district courts have declined to "impose[] liability on the clearing broker for the transgressions of the introducing broker." *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 425-26 (S.D.N.Y. 2008); *see also, e.g.*, *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) ("A clearing broker does not provide 'substantial assistance' to or 'participate' in a fraud when it merely clears trades."); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997) ("[P]rimary liability [under § 10(b)] cannot attach when the fraudulent conduct that is alleged is no more tha[n] the performance of routine clearing functions."). The district courts have so held even if the clearing broker was alleged to have known that the introducing broker was committing fraud,

---

[8] There is no private right of action under § 10(b) or Rule 10b-5 for aiding and abetting claims. *See Stoneridge*, 552 U.S. at 157-58; *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

*Fezzani*, 592 F. Supp. at 425; even if the clearing broker was alleged to have been clearing *sham* trades for the introducing broker, *In re Blech*, 961 F. Supp. at 584; and even if the clearing broker was alleged to have failed to enforce margin requirements against the introducing broker—thereby allowing the introducing broker's fraud to continue—in violation of Federal Reserve and NYSE rules, *Cromer*, 137 F. Supp. 2d at 471-72.

In the second, much more limited category of cases, district courts have found plaintiffs' allegations to be adequate—and so have permitted claims to proceed—where a clearing broker is alleged effectively to have shed its role as clearing broker and assumed direct control of the introducing firm's operations and its manipulative scheme. Thus, in *Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65 (S.D.N.Y. 2000), the district court granted class certification in a suit brought by investors against clearing broker Bear Stearns for its role in the introducing firm A.R. Baron & Company's ("Baron") scheme to defraud investors. The *Berwecky* plaintiffs alleged that Bear Stearns "asserted control over Baron's trading operations by, *inter alia*, placing Bear, Stearns' employees at Baron's offices to observe Baron's trading activities, approving or declining to execute certain trades, imposing restrictions on Baron's inventory, and loaning funds to Baron." *Id*. at 67. The plaintiffs alleged that Bear Stearns asserted control over Baron's activities "in order to keep A.R. Baron a viable concern while Bear,

26

Stearns . . . continued to reap the large profits they received from their activities with A.R. Baron." *Id.* The district court found the allegations that Bear Stearns "control[led]" the implementation of the scheme to manipulate the price of securities sold by Baron sufficient to satisfy Rule 23(b)(3)'s predominance requirement. *Id.* at 68-69.

Similarly, the district court in *In re Blech*, 961 F. Supp. 569, found that the "[c]omplaint crosse[d] the line dividing secondary liability from primary liability when it claim[ed] that Bear Stearns [the clearing broker] 'directed' or 'contrived' certain allegedly fraudulent trades." *Id.* at 584. The plaintiffs in *Blech* had alleged that "Bear Stearns 'directed' Blech & Co. [the introducing firm] to sell Blech Securities by demanding that Blech reduce its debit balance with knowledge of Blech's history of sham trading, and that Blech, in response to Bear Stearns's pressure, engaged in manipulative parking transactions, which Bear Stearns cleared." *Id.* The district court concluded that the alleged "*instigation* of trading that Bear Stearns knew or should have known would result in fraudulent trades that would artificially inflate the price of the Blech Securities," and Bear Stearns's subsequent "clearing of the resultant fraudulent trades for its own pecuniary benefit" constituted "an attempt to affect the price of the Blech Securities" and was therefore sufficient to state a claim for primary liability under § 10(b). *Id.* at 584-85 (emphasis added).

27

We think that the distinctions drawn by these district courts properly implement Rule 382's scheme, which allows clearing and introducing brokers to contractually allocate functions amongst themselves. As noted above, this scheme permits clearing brokers to place the burden of monitoring trades on the introducing broker. In return, the introducing broker has access to the services of the clearing broker and thus avoids the overhead costs associated with providing clearing services in-house. In view of the importance of not holding clearing brokers liable for conduct for which the *introducing* broker assumed responsibility pursuant to NYSE Rule 382, we here adopt the approach thus far taken by the district courts of this Circuit in § 10(b) suits against clearing brokers governed by Rule 382.

In the present case, however, we conclude that the district court misapplied this approach. As the district court noted, the Levitt Plaintiffs do not argue that Bear Stearns's liability flows directly from its alleged participation in Sterling Foster's scheme. Rather, they contend that this participation triggered a duty to disclose the scheme, rendering Bear Stearns's omission to do so actionable. In our view, however,—and assuming, *arguendo*, that this theory of liability is otherwise available[9]—the Levitt Plaintiffs have failed to allege

---

[9] There is some disagreement over whether the act of market manipulation itself triggers a duty to disclose. *Compare Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009) (distinguishing between omission and manipulation claims

28

sufficiently direct involvement by Bear Stearns in Sterling Foster's scheme to manipulate the ML Direct IPO to create any such duty owed by Bear Stearns to Sterling Foster's customers. And absent a duty to disclose, there can be no material omission under § 10(b), precluding the Levitt Plaintiffs from invoking the presumption of reliance of *Affiliated Ute* and thereby satisfying the predominance requirement of Rule 23(b)(3).[10]

*IV. Duty of the Clearing Broker in the Present Case*

Here, the Complaint itself alleges only that Bear Stearns, "knowing of the fraud, *joined in*, *permitted* and *facilitated* said fraud and market manipulation." (emphasis added). The Levitt Plaintiffs do not assert that Bear Stearns instigated or directed the manipulative scheme. Rather, they allege, at most, that Bear Stearns approved the ML Direct offering; that it agreed to serve as clearing broker for the offering; and that it may have violated certain NASD rules and Federal Reserve regulations in connection with the offering. We think

under Rule 10b-5), *with In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 381 (S.D.N.Y. 2003) (holding that market manipulation creates a duty to disclose). Given our conclusion that Bear Stearns was not sufficiently involved in Sterling Foster's manipulative scheme for any kind of primary liability to attach, we need not address the question. We similarly need not identify in detail other possible sources of an actionable duty to disclose. We note, however, that courts have found that "[f]iduciary relationships and their concomitant duty to disclose may be established by state or federal law." *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991) (collecting cases).

[10] In light of this disposition, we likewise need not and do not address whether the Levitt Plaintiffs could satisfy the other elements of an action under §§ 10(b) and 10b-5 for the purpose of class certification.

29

substantially more direct participation by the clearing broker is required for a duty of disclosure to exist.

To be sure, the Levitt Plaintiffs have attempted to show that Bear Stearns did more than simply clear trades; in particular, they offer expert testimony that Bear Stearns' activities in connection with the ML Direct IPO were "irregular." These arguments are unavailing.

First, Plaintiffs claim that Bear Stearns' requirement that it approve the ML Direct offering and its demand for a personal guarantee and increased collateral from Sterling Foster were unusual. They do not assert, however, that any of these requirements are atypical in the industry or, even if they are, that this would support the conclusion that Bear Stearns had a duty to disclose Sterling Foster's misconduct. To the contrary, Bear Stearns' expert testified that requirements for increased collateral and approval of large IPOs were standard among clearing brokers and represented an attempt to mitigate the clearing broker's risk. The Levitt Plaintiffs' allegations thus boil down to a claim that the demand for a personal guarantee and increased collateral are "irregular" in the context of Bear Stearns' alleged knowledge that Sterling Foster would attempt to manipulate the market in ML Direct shares by releasing the Selling Securityholders from the lock-up agreement after trading commenced. But as discussed above, a clearing broker's knowledge of the fraud alone is an

insufficient basis on which to impose a duty of disclosure on the clearing broker; we do not think otherwise-normal clearing practices become "irregular" simply because they are undertaken with such knowledge. Certainly plaintiffs here do not allege that Bear Stearns, beyond merely acquiescing in the ML Direct scheme, went so far as to control and implement that scheme in the manner alleged, for example, in *Berwecky*.

The Levitt Plaintiffs next assert that the statements on the trade confirmations issued by Bear Stearns to Sterling Foster customers who purchased shares of ML Direct in the IPO contained misleading statements. The confirmations contained boilerplate language indicating that Sterling Foster "makes a mkt [market] in this security [i.e., ML Direct], and acted as principal." Bear Stearns responds that the trade confirmations were automatically populated by Bear Stearns with data imputed by Sterling Foster. Plaintiffs do not contradict this assertion on appeal. Instead, they argue that Bear Stearns had a duty to correct Sterling Foster's misrepresentation. This conduct standing alone, however, does not constitute the sort of extraordinarily high involvement in the fraudulent scheme necessary to create such a duty on the part of Bear Stearns.

Plaintiffs argue that Bear Stearns went beyond merely serving as an ordinary clearing broker because "Bear Sterns *allowed* Sterling Foster to resell

31

. . . repurchased shares from September 12 through September 30, 1996, 'as of' September 4," at the share price prevailing on September 4, rather than on the date the shares were actually sold. Appellee's Br. 27-28 (emphasis added). Even assuming this characterization of Bear Stearns' actions to be correct (which Bear Stearns contests), we fail to see how allowing or clearing putatively sham or manipulative trades is comparable to *directing* or *instigating* such trades, *see In re Blech*, 961 F. Supp. at 584-85.

Finally, the Levitt Plaintiffs allege that Bear Stearns' conduct was "irregular" because the clearing broker violated Regulation T , 12 C.F.R. pt. 220, in connection with the ML Direct offering. The district court also relied heavily on Bear Stearns' alleged violations of Regulation T, citing the contention of Plaintiffs' expert that Bear Stearns' failure to cancel trades (as Regulation T demanded) "gave Sterling Foster more time to find buyers to purchase the canceled shares, thus enabling Sterling Foster to maintain an artificial price for ML Direct." *Levitt*, 270 F.R.D. at 134. Even if a clearing broker's violations of Regulation T are "irregular," however, they do not support the conclusion that the clearing broker has a duty to disclose a broker-dealer's misconduct to that broker-dealer's customers.

Regulation T was promulgated by the Federal Reserve Board under § 7 of the Securities Exchange Act, 15 U.S.C. § 78g, *see Mfrs. Hanover Trust Co. v.*

32

*Drysdale Secs. Corp.*, 801 F.2d 13, 22 (2d Cir. 1986), and, as relevant here, sets forth time periods for payment of customer purchases in a broker-dealer account. Regulation T provides that a broker-dealer "shall promptly cancel or otherwise liquidate a transaction . . . for which the customer has not made full cash payment within the required time." 12 C.F.R. § 220.8(b)(ii)(4). The Levitt Plaintiffs argue that Bear Stearns violated Regulation T when it failed to cancel unpaid trades in Sterling Foster accounts during the ML Direct IPO. We have held, however, that there is no private right of action under § 7 or under Federal Reserve Board Regulation U, also promulgated under § 7, *see Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 312 (2d Cir. 1985) (finding no private right of action under § 7 or Regulation U and observing in support of that holding that the "underlying purpose of section 7 is to regulate the use of credit in securities transactions").

Plaintiffs do not directly argue for a private cause of action for a clearing broker's Regulation T violation, but rather urge that Bear Stearns can be held liable as a primary violator of § 10(b) because its violations of Regulation T permitted Sterling Foster to manipulate the market for ML Direct by allowing trades to go unpaid until the Selling Securityholders delivered their shares. But, in the absence of other conduct of Bear Stearns outside the normal course of activities for a clearing broker, deeming the violation of Regulation T to trigger

33

a duty to disclose, and in so doing to constitute a material omission under § 10(b), would be tantamount to the creation of a right of action for a Regulation T violation. The margin and cancellation requirements of Regulation T "are designed to protect the viability of brokerage houses and not to protect investors," *Cromer*, 137 F. Supp. 2d at 472 (citing *Bennett*, 770 F.2d at 312), and we decline to effectively adopt a private right of action for investors to enforce these regulations.

The Levitt Plaintiffs have not adduced any evidence at the class certification stage that indicates that Bear Stearns directed or instigated sham or fraudulent trades, or that it otherwise so departed from the performance of normal clearing functions as to establish that Bear Stearns owed Sterling Foster's customers a duty of disclosure. Without a duty of disclosure, Bear Stearns could not have engaged in a material omission for the purpose of § 10(b); in the absence of a material omission, Plaintiffs cannot employ a classwide presumption of reliance under *Affiliated Ute*; nor, therefore, can Plaintiffs satisfy the predominance requirement of Rule 23(b)(3). The district court accordingly erred in certifying a (b)(3) class.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court and remand for further proceedings consistent with this opinion.