**UNITED STATES of America, Appellee,**

v.

**James Sutton REGAN, Jack Z. Rabinowitz, Steven Barry Smotrich, Charles M. Zarzecki, Paul A. Berkman, and Bruce Lee Newberg, Defendants–Appellants.**

Nos. 25 to 30, Dockets 89–1591, 89–1592, 89–1600 to 89–1602 and 89–1614.

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1991.

Decided June 28, 1991.

Jerome Kurtz, Washington, D.C., Theodore V. Wells, Jr., Roseland, N.J. (Robert L. Krakower, Lowenstein, Sandler, Kohl, Fisher & Boylan, of counsel), for defendant-appellant Regan.

Gerald B. Lefcourt, New York City (Joshua L. Dratel, Frederick P. Hafetz, Susan R. Necheles, Jeremy Gutman, Goldman & Hafetz, of counsel), for defendant-appellant Newberg.

Lawrence S. Bader, New York City (Paul R. Grand, Morvillo, Abramowitz & Grand, P.C., of counsel), for defendant-appellant Zarzecki.

Robert Hill Schwartz (Richard A. Greenberg, Newman & Schwartz, New York City, of counsel), for defendant-appellant Rabinowitz.

Joseph A. Hayden, Jr. (Alan Silber, Paulette L. Pitt, Hayden, Perle & Silber, of counsel), Hoboken, N.J., for defendant-appellant Smotrich.

Jack Arseneault, Roseland, N.J., for defendant-appellant Berkman.

Jerome Kurtz, Washington, D.C., Abe F. Goldstein, Yale Law School, New Haven, Ct., and David Mills, Roseland, N.J., of counsel, for defendants-appellants.

Neil S. Cartusciello, Asst. U.S. Atty., New York City (Otto Obermaier, U.S. Atty. S.D.N.Y., Roger S. Hayes, Acting U.S. Atty., Miguel A. Estrada, Kerri Martin Bartlett, David E. Brodsky, Asst. U.S. Attys., and Peter G.A. Safirstein, Sp. Asst.

U.S. Atty., New York City of counsel), for appellee.

Before VAN GRAAFEILAND, MINER, and MAHONEY, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

James S. Regan, Jack Z. Rabinowitz, Steven B. Smotrich, Charles M. Zarzecki, Paul A. Berkman, and Bruce L. Newberg appeal from judgments of the United States District Court for the Southern District of New York (Carter, J.) convicting them of tax fraud, securities fraud, mail and wire fraud, false partnership records and reports, conspiracy to commit all of the foregoing, and RICO. All of the appellants, save Newberg, were associated with Princeton Newport Partners, L.P. (PN), a limited partnership investment firm with offices in New Jersey and California. Appellant Regan was a managing partner and the firm's resident "tax authority".[1] For convenience of discussion, we have divided the charges against appellants into two general groupings, one dealing with alleged tax fraud and the other dealing with alleged securities fraud.

## THE TAX FRAUDS

A stockbroker who sells stock that he does not own must either buy or borrow it from someone else in order to make delivery on the settlement date. Because the two methods of procurement have different legal consequences, including the resultant tax treatment, it is important to know what method the broker used.

In 1978, Congress created a means for making this determination at least in part by enacting section 1058 of the Code, 26 U.S.C. § 1058. *See* S.Rep. No. 762, 95th Cong., 2d Sess. 7, *reprinted in* 1978 U.S. Code Cong. & Admin.News 1286, 1292–93. Section 1058 provides in substance that no gain or loss shall be recognized if the procurement transaction is made pursuant to an agreement that (1) provides for the return of securities identical to those trans-

ferred; (2) requires that payments be made to the transferor in amounts equal to the interest, dividends, and other distributions paid on the transferred securities; (3) does not reduce the transferor's risk of loss or opportunity for gain on the transferred securities; and (4) meets such other requirements as may be prescribed by Treasury regulations.

In 1983, the Secretary of the Treasury proposed regulation 1.1058–1, which, although never promulgated, shed light upon the meaning of section 1058. Subdivision (e) of the proposed regulation provides in substance that, if a transfer of securities is intended to comply with section 1058 but fails to do so because the transfer agreement does not satisfy the above-described requirements of that section, gain or loss will be recognized on the transfer in accordance with 26 U.S.C. § 1001.

From time to time in the period between 1984 and 1987, PN owned substantial quantities of stock that had depreciated in value and whose sale would provide PN with opportunities to take tax losses. Regan testified that, prompted by correspondence from his accountants, a report of the Tax Section of the Association of the Bar of the City of New York, and his own study of section 1058 and proposed regulation 1.1058–1, he concluded that PN could take those losses by means of sales and repurchase arrangements with other brokerage or investment houses so long as the arrangements between PN and the other houses did not satisfy the requirements of section 1058. Regan felt that this very lack of compliance would enable PN to take tax losses on the transactions. Based on this belief, PN entered into some fifty-nine transactions with other brokerage and investment houses, consisting of sales of stock by PN to those houses and agreements to resell to PN at fixed prices at later dates.

Appellants, following Regan's lead, believed that these transactions did not satisfy section 1058 requirements in that their

---

1. For a more complete factual background, see Judge Carter's opinions reported at 699 F.Supp. 36, 706 F.Supp. 1102, 713 F.Supp. 629, and 726 F.Supp. 447, and this court's prior opinion reported at 858 F.2d 115.

terms were not reduced to writing, did not provide for termination upon short notice, and did not contain legally enforceable rights of repurchase. Moreover, the brokerage houses to whom the stock was sold had complete control of the stock in their possession while PN had none, thus depriving PN of the opportunity to avoid loss or capitalize on gain during that period. Also, the agreed-upon repurchase price might vary substantially from the then-existing market price.

■ The district court described this as a "sophistical" treatment of section 1058, 726 F.Supp. at 451, and rejected it out of hand. Stating that he didn't think he had "to give a contention that was contrary to what [he] regard[ed] as being the law" (Tr. at 4046), he held that appellants' contention concerning section 1058 had no substance and the section had "no applicability to defendants' case," 726 F.Supp. at 451. This was prejudicial error. The issue in the case was not whether appellants' construction of section 1058 was correct or even objectively reasonable but whether it was made in good faith. *Cheek v. United States*, — U.S. ——, 111 S.Ct. 604, 611, 112 L.Ed.2d 617 (1991); *United States v. Murdock*, 290 U.S. 389, 395–98, 54 S.Ct. 223, 225–26, 78 L.Ed. 381 (1933); *United States v. Pabisz*, 936 F.2d 80, 83 (2d Cir.1991); *see also United States v. Aitken*, 755 F.2d 188, 189–93 (1st Cir.1985).

Although appellants were not charged with violating section 1058, that section became pivotal in the case because appellants believed that it authorized them to do just what they did, *i.e.*, take tax losses. If this belief was held in good faith, they could not be held criminally liable for proceeding on that basis. Appellants offered substantial evidence of their good faith reliance on their interpretation of section 1058, some of which the court received and some of which it rejected. For example, the Tax Section of the Association of the Bar of the City of New York appears to have interpreted section 1058 in somewhat the same manner as did Regan. The report of the Committee upon which Regan relied

stated in substance that the distinguishing feature between a loan and a sale of securities was whether the risk of loss or opportunity for gain was retained by the person making the transfer. This, of course, was in accord with the generally accepted rule that "for Federal income tax purposes, the owner of property must possess meaningful burdens and benefits of ownership." *See* H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2, at 1132, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 806. Appellants also offered the testimony of two acknowledged tax experts to the effect that Regan's interpretation of section 1058 was not unreasonable, but the district court refused to permit these experts to testify.

Whether, as appellants contend, the district court erred in its evidentiary rulings concerning this evidence is a matter we need not decide. The issue of appellants' good faith reliance on section 1058 as appellants interpreted it was squarely raised and argued. The district court should have instructed the jury that, if it found the reliance was held in good faith, the defendants could not be held criminally liable for proceeding in accordance with that reliance. *See United States v. Durham*, 825 F.2d 716, 719 (2d Cir.1987); *United States v. Pedroza*, 750 F.2d 187, 204–05 (2d Cir. 1984), *cert. denied*, 479 U.S. 842, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986); *United States v. Alfonso–Perez*, 535 F.2d 1362, 1365 (2d Cir. 1976).

The record is clear that appellants requested a charge specifically directed to their claim of good faith reliance on section 1058. Indeed, they even cited *Durham, supra*, to the district court as authority for their entitlement to such a charge. Quoting *Pedroza, supra*, we said in *Durham* that "the court's general instructions on specific intent were not 'adequate to inform the jury that if it believed the defendants' theory it was entitled to conclude that they did not have the requisite intent to be convicted of the offenses charged.' " 825 F.2d at 719. In the instant case, where appellants were charged with sixty-four counts covering the waterfront of tax fraud, securities fraud, mail and wire fraud, conspiracy, and RICO, a generalized charge on

good faith was insufficient to instruct the jury concerning appellants' specific good faith defense based on section 1058. Appellants were entitled to have the trial court clearly instruct the jury, relative to appellants' theory of defense to the tax charges, that the theory if believed justified acquittal on those charges. *Alfonso–Perez, supra,* 535 F.2d at 1365.

One of the most esoteric areas of the law is that of federal taxation. It is replete with "full-grown intricacies", and it is rare that a "simple, direct statement of the law can be made without caveat." 1 *Mertens Law of Federal Income Tax* § 1.01. Justice White, writing for the Court majority in *Cheek, supra,* stated that, because of the proliferation of tax statutes and regulations, the common-law presumption that every person knows the law does not apply where violations of federal criminal tax laws are alleged. Instead, proof of guilt in such cases must be predicated upon a "'voluntary, intentional violation of a known legal duty.'" 111 S.Ct. at 610 (quoting *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973)).

This rule applies to alleged violations of the "hierarchy of tax offenses set forth in §§ 7201–7207, inclusive." *United States v. Bishop,* 412 U.S. 346, 359, 93 S.Ct. 2008, 2016, 36 L.Ed.2d 941 (1973). It also applies to 18 U.S.C. § 371 conspiracies to violate one or more of the hierarchy of tax offenses. *Ingram v. United States,* 360 U.S. 672, 677–78, 79 S.Ct. 1314, 1318–19, 3 L.Ed.2d 1503 (1959); *United States v. Gurary,* 860 F.2d 521, 525 (2d Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989).

The Government's burden in proving a mail or wire fraud offense, 18 U.S.C. §§ 1341 and 1343, is even more onerous. These are specific intent crimes. *United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983); *United States v. Martin–Trigona,* 684 F.2d 485, 492 (7th Cir. 1982). The Government is required to prove beyond a reasonable doubt that the defendant was guilty of a "conscious knowing intent to defraud." *United States v. Kyle,* 257 F.2d 559, 564 (2d Cir.1958), *cert.*

*denied,* 358 U.S. 937, 79 S.Ct. 327, 3 L.Ed.2d 308 (1959). Such wrongful intent is the "essence of the crime." *Pelz v. United States,* 54 F.2d 1001, 1005 (2d Cir. 1932). Where, as here, there is little dispute concerning the making and filing of the allegedly fraudulent returns, the existence vel non of culpable intent or lack of good faith is a crucially important issue in the case. *See United States v. Ballard,* 322 U.S. 78, 82, 64 S.Ct. 882, 884, 88 L.Ed. 1148 (1944); *United States v. Brandt,* 196 F.2d 653, 657 (2d Cir.1952); *United States v. Foshee,* 578 F.2d 629, 634 (5th Cir.1978).

Despite numerous requests by appellants to charge otherwise, the district court persisted in viewing section 1058 objectively, insisting that the court was the sole judge of the law. That, of course, was true. However, the issue for the jury was not how the district court interpreted section 1058; it was how the defendants in good faith interpreted it. "A jury is the ultimate discipline to a silly argument." *United States v. Burton,* 737 F.2d 439, 443 (5th Cir.1984). The district court's failure to squarely present this issue to the jury was a prejudicial error that tainted all of the tax hierarchy charges.

Because we are reversing and remanding the predicate tax offenses upon which the bulk of the RICO charge was based, and perforce the RICO charge itself, we need not become involved in the disputed issue whether federal tax violations can give rise to a RICO cause of action. *See United States v. Henderson,* 386 F.Supp. 1048, 1052–54 (S.D.N.Y.1974). *But see United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1187–88 n. 13 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). Before this lengthy case is retried, the Government may decide to withdraw the RICO count in view of the Department of Justice's July 1989 guidelines, which substantially curtail the use of tax frauds as direct or indirect predicate RICO offenses, and the district court's judicious decision to eliminate the forfeiture of assets by the defendants Regan, Rabinowitz, Berkman, and Smotrich. *See* 726 F.Supp. at 459.

Appellants contend further that the district court's charge concerning "economic substance", a necessary element of a tax deductible loss, also was prejudicially erroneous. The court charged the jury that a transaction is without economic substance if (1) the transaction had no business purpose apart from the creation of tax deductions and (2) the transaction was subject to no market risk. The court stated that transactions have no business purpose apart from the creation of tax deductions if they are not intended either to make or preserve any profit or to limit a loss in any way except for the tax benefits and that transactions are subject to no market risk "if changes in market price cannot have any effect on the transaction."

■ When appellants objected to this charge, the district court stated that it was substantially the same charge that we approved in *United States v. Atkins*, 869 F.2d 135, 140 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 72, 107 L.Ed.2d 39 (1989), and *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 97 n. 9 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), and the district court saw no reason to change it. However, a charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts. The district court must tailor its instructions to the facts of the case before it. 2 C. Wright, *Federal Practice and Procedure* § 485, at 710–13. "Each case has its own peculiar facts and formalized instructions must be tailored to the facts and issues." Devitt, *Ten Practical Suggestions About Federal Jury Instructions*, 38 F.R.D. 75, 77 (1965).

■ Appellants contend that, while the use of the phrase "creation of tax deductions" was proper in *Atkins* and *Ingredient Technology* where it referred to the artificial creation of losses upon which claims for tax deductions could be made, it was not proper where, as here, it referred to the creation of tax deductions based upon legitimate book losses that already existed. To be allowable as an income tax deduction, a business loss must be evidenced by a closed and completed transaction, *i.e.*, "some identifiable event ending the interest of the taxpayer in the property." *Williams v. Commissioner*, 584 F.2d 90, 94 (5th Cir.1978) (per curiam); *see* 26 C.F.R. § 1.165–1(b). In this respect, every taxpayer who claims a deduction based on the sale of an asset that has depreciated in value may be said to have "created a tax deduction." Appellants point out that the sales at issue herein were made at or near the market price of the stock that was sold. They assert correctly that, as a basic proposition, a bona fide sale that has no sham implications may receive favorable tax treatment even though it is made for the express purpose of realizing an existing book loss. *See* 7 *Mertens Law of Federal Income Taxation* § 28.08, at 47.

A similar problem exists with respect to the district court's definition of "no market risk", *i.e.*, that there is no market risk "if changes in market price cannot have any effect on the transaction." We assume that what the district court meant by this phrase is that there would be no market risk if the transaction would be carried through to completion as planned regardless of any movement in the market. This is not the same as saying that there would be no market risk if market movements had no "effect" on the transaction. In the instant case, movements in the market would have an effect on the transaction. As already pointed out, the brokerage houses to whom PN sold its stock had control of the stock in their possession. They could sell and repurchase in response to movements in the market, but PN could not. At the time the stock was returned, its actual market value might be substantially below the previously agreed upon price. It cannot be gainsaid that the transactions at issue brought about changes in the economic interests of the parties. *See Rosenfeld v. Commissioner*, 706 F.2d 1277, 1282–83 (2d Cir.1983).

Without deciding whether, standing alone, the above-discussed problems associated with the district court's charge are of sufficient importance to require that the matter be submitted to another jury, we

conclude that they provide added support for that disposition.

## THE SECURITIES FRAUD

█ In March 1985, the firm of Drexel Burnham Lambert, Inc. was retained to underwrite a $25 million convertible bond offering for C.O.M.B. Co., a Minneapolis concern. Such bonds pay a fixed rate of interest and are convertible into common stock at a predetermined price. Accordingly, the higher the market value of the stock when the convertible bonds are offered for sale the more advantageous from the convertible standpoint the purchase of the bonds will appear to be. Because of this, the bonds can be sold at a lesser interest rate. Accordingly, corporations contemplating convertible bond offerings usually hope for a high market price for their stock and, in some cases, attempt to "levitate" the price into a higher range. This, of course, could adversely affect sales to those purchasers who are interested primarily in interest income. It also could adversely affect sales to prudent investors who are concerned about stock manipulation.

The Government's contention in substance is that, in the period just prior to the finalization of the underwriting agreement, Drexel, believing that C.O.M.B. was "levitating" the price of its stock, undertook by devious means to depress the price. Appellant Newberg, a bond trader for Drexel, sought to accomplish this by arranging with appellant Zarzecki, a trader for PN, for PN to sell 40,000 shares of C.O.M.B. short to a broker-dealer without disclosing to the dealer that PN was the seller or that Drexel was the moving party behind the entire deal. The Government contends that this was a violation of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, which bar the use of any device, scheme, or artifice to defraud, or any manipulative or deceptive device or contrivance in contravention of pertinent SEC rules and regulations. The jury, under proper charge, so found.

In enacting section 10(b), "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe Indus. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). For an informative discussion of the diverse devices that ingenious minds have conceived, see 3 Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud* § 7.3(220)–(227). The plan conceived by Newberg and Zarzecki fits comfortably within this "full range" of wrongful acts. *See, e.g., Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 792–93 (2d Cir.1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). "Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." *United States v. Charnay*, 537 F.2d 341, 351 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976). Appellants' argument that a fiduciary relationship must exist before liability can be found is without merit. The case of *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), upon which appellants rely involved trading on the basis of nonpublic information; here, appellants are charged with market manipulation. In sum, Newberg's and Zarzecki's convictions on the counts charging market manipulation in connection with the C.O.M.B. offering must be affirmed. Because all of the appellants were convicted on the conspiracy count which incorporates the charges of manipulating C.O.M.B.'s stock, their convictions on the conspiracy count also must be affirmed. *See United States v. Dixon*, 536 F.2d 1388, 1401–02 (2d Cir. 1976).

The Government has not requested that we salvage the RICO count by using only the C.O.M.B. securities fraud as the predicate act. Because we are remanding for a new trial on nine of the ten racketeering acts alleged in the RICO count and it is not clear that the jury would have found a RICO violation based on the 10 percent of the acts that remain, we believe that it is best to remand the portion of the RICO count that is based on the securities fraud

along with the portion that is based on the tax frauds. *See United States v. Ruggiero,* 726 F.2d 913, 922 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

### CONCLUSION

Conviction of all of the appellants on the conspiracy count, count no. 1, is affirmed. Conviction of appellant Newberg on the securities fraud counts, nos. 48 to 53, is affirmed. His conviction on all other counts save that of conspiracy is vacated, and the issues on those counts are remanded to the district court for further proceedings. Conviction of Zarzecki on the securities fraud count, no. 53, is affirmed. His conviction on all other counts save that of conspiracy is vacated, and the issues on those counts are remanded to the district court for further proceedings. Conviction of appellants Regan, Rabinowitz, Berkman, and Smotrich on all counts save that of conspiracy are vacated, and the issues on those counts are remanded to the district court for further proceedings.

MAHONEY, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that the securities fraud and conspiracy counts should be affirmed. I do not agree, however, that reversal of the tax and related counts is warranted by the district court's refusal specifically to instruct the jury regarding the defendants' asserted reliance on 26 U.S.C. § 1058. Nor do I perceive any error in the court's charge concerning "economic substance." I therefore respectfully dissent from the majority's rulings regarding the instructions of the district court.

### A. *The "Good Faith" Instructions.*

My colleagues conclude: "The district court should have instructed the jury that, if it found that the reliance [on section 1058 as appellants interpreted it] was held in good faith, the defendants could not be held criminally liable for proceeding in accordance with that reliance." The district court in fact gave the following instructions with regard to good faith:

If you find that the defendant acted in good faith in the honest belief that the representations he made were true, that he did not intend to defraud anyone, this constitutes a complete defense to the crime of mail or wire fraud.

. . . .

The defendants contend the government has failed to prove that they did not act in good faith.

Mr. Regan submits that it was his belief, based on his general knowledge of the tax laws and buttressed by the willingness of Akroyd and Merrill Lynch to engage in these trades, that both the day trades done in 1984 and the 31 day trades done in 1985 were entirely proper for tax purposes.

The other Princeton/Newport defendants contend that they relied on Mr. Regan's opinion as to the propriety of the trades. . . .

In connection with the false return counts, the court additionally instructed as follows:

If the defendant signed the tax return in good faith and believed it to be true in all material matters, he has not committed a crime and must be acquitted on these counts, even if the return was incorrect.

If you find that the tax return was not true as to a material matter, the central question is whether or not the defendant honestly believed that the return was true. The government has the burden of proving that the defendant did not have an honest belief in the truthfulness of the return.

Characterizing these rather extensive instructions as a "generalized charge on good faith," my colleagues find them "insufficient to instruct the jury concerning the appellants' specific good faith defense based on section 1058." In other words, the defendants were prejudiced by an instruction that their good faith defense was premised on Regan's "general knowledge of the tax laws," because defendants more specifically contended that Regan relied on section 1058. I am unpersuaded that a district court is required to present a defen-

dant's contentions with this level of particularity. The fact is that the theory of defense—to wit, bona fide reliance on the tax code—was squarely presented to the jury. It is unlikely that the jurors were misled because the district court failed to remind them of Regan's contention that section 1058 was at the center of his tax analysis.

Even assuming, however, that the district court arguably should have given an instruction more closely patterned after the defendants' section 1058 contention, the record does not disclose the specific objection to the court's instruction on the intent issue required by Fed.R.Crim.P. 30 to preserve a claim of instructional error. Defendants' proposed jury instructions included a paragraph that essentially summarized Regan's trial testimony regarding reliance on section 1058. When Judge Carter indicated at the charging conference that his instructions would not refer to section 1058, however, counsel did not contest the ruling, let alone argue that the defense theory would be gutted. After delivery of the charge, the only objections relating to defense contentions were that the court (1) failed to instruct that defendant Zarzecki contended that he never participated in any illegal activity, and (2) failed to instruct the jury on all the defense contentions concerning the manipulation of C.O.M.B. Co. securities. In response, the district court gave a supplemental instruction that both the government and the defendants had set forth more contentions than those presented in the jury charge.

In these circumstances, reversal may be premised only upon "plain error" in the jury instruction, see Fed.R.Crim.P. 52(b); i.e., where "failure to reverse would result in 'a miscarriage of justice which denied the defendant a fair trial.'" *United States v. Scarpa*, 913 F.2d 993, 1021 (2d Cir.1990) (quoting *United States v. Civelli*, 883 F.2d 191, 194 (2d Cir.), cert. denied, — U.S. ——, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989)). This doctrine is to be invoked sparingly, see *Scarpa*, 913 F.2d at 1021 (collecting cases), and I see no occasion for its application here.

**B. The "Economic Substance" Instruction.**

My colleagues find "added support" for their reversal of the tax related convictions from two criticisms of the district court's instructional definition of economic substance. Briefly, the government's theory of the case was as follows. PN invested in the so-called "convertible hedge," establishing a long position in convertible bonds while selling short the underlying stocks. With this hedged position, price fluctuations on the "long" side would more or less exactly be compensated by fluctuations on the "short" side. At the relevant times, short term capital losses were accorded beneficial treatment under the Internal Revenue Code.

In order to reap this tax benefit without disturbing the balance of their hedged position, the defendants concocted false sales of their losing securities. Specifically, PN would "sell" the securities to a brokerage house just before the end of the maximum short term holding period, with the understanding that PN would repurchase the securities at approximately the same price shortly thereafter. The government charged that the purported sales (whereby PN incurred and reported the short term losses) lacked economic substance, and that the losses were therefore unlawfully reported on PN's partnership returns.

The district court charged the jury that a transaction lacked economic substance if it (1) "had no business purpose apart from the creation of tax deductions" and (2) "was subject to no market risk." My colleagues criticize the first branch of this definition on the ground that the language "creation of tax deductions" might unfairly encompass a bona fide sale that is intended to realize an existing loss. This criticism was not presented to the district court either at the charging conference or in defendants' numerous objections following the charge. Indeed, the following similar language was contained in defendants' proposed jury instructions: "A sale has economic substance if it *could possibly* have an economic effect *other than the creation of a tax deduction* and the payment of the

sales price and costs incident to the sale...." (latter emphasis added).

Further, in *United States v. Atkins*, 869 F.2d 135 (2d Cir.1989), we approved the use of the same charge in a strikingly similar context. The defendants attempt to distinguish *Atkins* on the theory that its definition of economic substance applies only to cases in which phony losses are created, not cases where actual losses are *recognized* through the use of sham transactions. This will not do. *Atkins* involved a scheme falsely to *recognize* actual losses in value on the short legs of straddles via artificial sales and repurchases. Like this case, *Atkins* involved not false losses but false sales.

Finally, my colleagues are dissatisfied with the court's instruction "that transactions are subject to no market risk if changes in market prices cannot have any effect on the transaction." They essentially contend that PN took the risk that the parking transactions—the prearranged sales and repurchases at nearly identical prices—would not, as the majority puts it, be "carried through to completion as planned regardless of any movement in the market." In other words, after a brokerage house took possession of the parked securities, it might refuse to honor the prearranged transfer of the securities back to PN.

The risk that the brokerage house might sell the parked securities to a third party or otherwise decline to return them, despite the agreement to the contrary, seems indistinguishable from the risk in *United States v. Ingredient Technology Corp.*, 698 F.2d 88 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), that the seller of inventory to the taxpayer would refuse to repurchase that inventory as agreed. We nonetheless there held that the lack of an enforceable agreement did not result in risk that imparted such economic substance to the transaction as to preclude tax fraud. *Id.* at 94–95.

Moreover, the jury was entitled to consider the whole of the parking scheme to be the transaction that lacked economic substance. For example, in *United States v.*

*Glass*, 87 T.C. 1087 (1986), the taxpayers had invested, through straddles, in options for future delivery of a specified metal in a manner that would produce an ordinary loss in the initial tax year, and a capital gain in the next. *See id.* at 1095. The Tax Court concluded that the transaction that created the loss for the first year—the closing of the loss leg of the straddle—lacked economic substance. In disallowing the deductions, the court looked to the entirety of the tax avoidance scheme:

In determining deductibility, we believe that substance-over-form precludes us from focusing solely upon the losses incurred by the closing of the sold options in year one of the London options strategy, to the exclusion of all that followed. For this reason we hold, as we have done before, that the relevant transaction was petitioners' entire commodity tax straddle scheme.... What petitioners invested in here with the respective broker/dealers was a prearranged sequence of trading calculated to achieve a tax-avoidance objective—not investments held for non-tax profit objective.

87 T.C. at 1163.

I note that because of the plethora of taxpayers involved in the case, the *Glass* decision has been affirmed on appeal by at least eight circuits. *See Lee v. Commissioner*, 897 F.2d 915 (8th Cir.1989); *Dewees v. Commissioner*, 870 F.2d 21 (1st Cir. 1989); *Friedman v. Commissioner*, 869 F.2d 785 (4th Cir.1989); *Keane v. Commissioner*, 865 F.2d 1088 (9th Cir.1989); *Ratliff v. Commissioner*, 865 F.2d 97 (6th Cir. 1989); *Killingsworth v. Commissioner*, 864 F.2d 1214 (5th Cir.1989); *Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989); *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir.1988).

Further, I note that Judges Breyer and Posner observed that while the straddle trading *in theory* might involve economic substance, the Tax Court did not err in concluding that the particular trades at issue were executed in a manner that lacked economic substance. *See Dewees*, 870 F.2d at 32; *Yosha*, 861 F.2d at 499.

In sum, I do not concur in the majority's rulings regarding instructional error by the district court, and therefore respectfully dissent from those rulings. I do not reach the complex of issues concerning the tax and related counts that would be presented if the majority shared my views concerning the jury charge.