**14-3983,09-4414-cv**
**Fezzani v. Bear, Stearns & Co., Inc.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

April Term, 2011

(Decided: January 30, 2015)

Docket No. 14-3983, 09-4414

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ON PETITION FOR REHEARING

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MOHAMMED FEZZANI, CIRENACA FOUNDATION, DR. VICTORIA BLANK, LESTER BLANK, JAMES BAILEY, JANE BAILEY, BAYDEL LTD., MARGARET BURGESS, PATRICK BURGESS, BOOTLESVILLE TRUST, AND ADAM CUNG,

Plaintiffs-Appellants,

v.

BEAR, STEARNS & CO. INC., BEAR STEARNS SECURITIES CORP., RICHARD HARRITON, MORRIS WOLFSON, ARIELLE WOLFSON, ABRAHAM WOLFSON, TOVIE WOLFSON, ANDERER ASSOCIATES, BOSTON PARTNERS, WOLFSON EQUITIES, TURNER SCHARER, CHAN SASHA FOUNDATION, UNITED CONGREGATION MESERAH, ISAAC DWECK, INDIVIDUALLY AND AS CUSTODIAN FOR NATHAN DWECK, BARBARA DWECK, MORRIS I. DWECK, RALPH I. DWECK, JACK DWECK, FAHNESTOCK & CO. INC., BARRY GESSER, MICHAEL REITER, AND APOLLO EQUITIES,

Defendants-Appellees,

ARTHUR BRESSMAN, ANDREW BRESSMAN, RICHARD ACOSTA, GLENN O'HARE, JOSEPH SCANNI, BRETT HIRSCH, GARVEY FOX, MATTHEW HIRSCH, RICHARD SIMONE, CHARLES PLAIA, JOHN MCANDRIS, JACK WOLYNEZ, ROBERT GILBERT, FIRST HANOVER SECURITIES, INC., BANQUE AUDI SUISSE GENEVE, FOZIE FARKASH, RAWAI RAES, BASIL SHIBLAQ, IYAD SHIBLAQ, KEN STOKES, MILLO DWECK, BEATRICE DWECK, RICHARD DWECK, ISAAC B. DWECK, HANK DWECK, and DONALD & CO.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:  WINTER, CABRANES, and LOHIER, Circuit Judges.

Petition for panel rehearing or rehearing en banc of a portion of this panel's opinion and summary order dated May 7, 2013, which affirmed the district court's dismissal of federal securities law fraud claims against a clearing broker and individual investors.  716 F.3d 18; 527 Fed. Appx. 89.  The petition for panel rehearing is denied.

Judge Lohier concurs in part and dissents in part in a separate opinion.

Max Folkenflik, Folkenflik & McGerity, New York, New York, for Plaintiffs-Appellants.

Kerry A. Dziubek and Michael D. Schissel, Arnold & Porter LLP, New York, New York, for Defendants-Appellees Bear, Stearns & Co. Inc. and Bear, Stearns Securities Corp. (Now J.P. Morgan Securities Inc. and J.P. Morgan Clearing Corp.).

Howard Wilson and Scott A. Eggers, Proskauer Rose LLP, New York, New York, for Defendant-Appellee Richard Harriton.

Anne K. Small, Michael A. Coley, Jacob H. Stillman, John W. Avery, and Jeffrey A. Berger, for amicus curiae The Securities and Exchange Commission, Washington, DC.

WINTER, Circuit Judge:

This opinion addresses petitions for rehearing by appellants from the court's summary order and from the opinion filed the same day.  It also addresses an amicus brief filed by the Securities and Exchange Commission in support of the Petition for

2

Rehearing from the panel opinion. Familiarity with the summary order, the panel opinion, and the dissent from the panel opinion is assumed. We deny appellants' petitions.

I.

The petition for rehearing relating to the summary order argues that this court's decision in Levitt v. J.P. Morgan, 710 F.3d 454 (2d Cir. 2013), filed just before the summary order, is inconsistent with that summary order with respect to the complaint's allegations of Bear Stearns' liability as the clearing broker for Baron's fraud. We disagree.

We begin by noting that the issue in Levitt was whether the common issues with regard to the liability of clearing brokers for the fraud or manipulation of introducing brokers so predominated over individual issues as to justify certification of a class. See Fed. R. Civ. P. 23(b)(3). That issue necessarily caused a discussion of the caselaw governing such liability. That discussion stated in part:

> III. Duty of a Clearing Broker (Generally)
> We have previously said that "a clearing 'agent [ ]' is generally under no fiduciary duty to the owners of the securities that pass through its hands" . . . .
>
> [D]istrict courts in this Circuit have distinguished two categories of cases. First, in cases where a clearing broker was simply providing normal clearing services, district courts have declined to "impose [ ] liability on the clearing broker for the transgressions of the introducing broker." Fezzani v. Bear, Stearns & Co., 592 F.Supp.2d

3

410, 425-26 (S.D.N.Y. 2008). The district courts have so held even if the clearing broker was alleged to have known that the introducing broker was committing fraud, Fezzani, 592 F.Supp.2d at 425; even if the clearing broker was alleged to have been clearing sham trades for the introducing broker . . . and even if the clearing broker was alleged to have failed to enforce margin requirements against the introducing broker -- thereby allowing the introducing broker's fraud to continue -- in violation of Federal Reserve and NYSE rules.

In the second, much more limited category of cases, district courts have found plaintiffs' allegations to be adequate -- and so have permitted claims to proceed -- where a clearing broker is alleged effectively to have shed its role as clearing broker and assumed direct control of the introducing firm's operations and its manipulative scheme. Thus, in Berwecky v. Bear, Stearns & Co., 197 F.R.D. 65 (S.D.N.Y. 2000), the district court granted class certification in a suit brought by investors against clearing broker Bear, Stearns for its role in the introducing firm A.R. Baron & Company's ("Baron") scheme to defraud investors. The Berwecky plaintiffs allege that Bear Stearns "asserted control over Baron's trading operations by, inter alia, placing Bear, Stearns' employees at Baron's offices to observe Baron's trading activities, approving or declining to execute certain trades, imposing restrictions on Baron's inventory, and loaning funds to Baron." Id. at 67. The plaintiffs alleged that Bear Stearns asserted control over Baron's activities "in order to keep A.R. Baron a viable concern while Bear, Stearns . . . continued to reap the large profits they received from their activities with A.R. Baron." Id. The district court found the allegations that Bear Stearns "control[led]" the implementation of the scheme to manipulate the price of securities sold by Baron sufficient to satisfy Rule 23(b)(3)'s predominance requirement. Id. at

4

68-69.

<u>Levitt</u>, 710 F.3d at 465-67 (some internal citations omitted).

The petition argues that <u>Levitt</u> held that the allegations in <u>Berwecky</u> were sufficient to state a claim for relief under Rule 12(b)(6) against a clearing broker. The petition further notes, correctly, that the allegations in <u>Berwecky</u> that "[Bear Stearns] asserted control over Baron's trading operations by, *inter alia*, placing Bear, Stearns' employees at Baron's offices to observe Baron's trading activities, approving or declining to execute certain trades, imposing restrictions on Baron's inventory and loaning funds to Baron," <u>Berwecky</u>, 197 F.R.D. at 67, are substantially identical to those in the present case. The complaint here alleges that "Bear Stearns assumed control over and sent Bear employees to Baron to 'enforce that control'" and required that every trade ticket be checked and "reviewed every order at this discretion [to] determine whether to execute the trade." Thus, because the pertinent factual allegations in the present case and <u>Berwecky</u> are substantially identical, the petition concludes that our affirmance by summary order resolved the merits of the claim incorrectly.

However, <u>Levitt</u> also cited the district court opinion in <u>Fezzani</u> twice favorably, the very decision that our summary order affirmed, and any seeming inconsistency evaporates once it is recognized that <u>Levitt</u>'s discussion quoted above was entirely in

5

the context of determining only whether a class was properly certified under Fed. R. Civ. P. 23(b)(3) and not whether the factual allegations were sufficient under Rule 12(b)(6). Levitt, 710 F.3d at 465. Indeed, Berwecky was itself a district court decision under Rule 23(b), and the issues regarding the legal sufficiency of the allegations were never finally determined. Berwecky, 197 F.R.D. at 68-69.

The issues regarding the sufficiency of the pleadings under Rule 12(b)(6) are quite different from those regarding certification of a class pursuant to Rule 23(b)(3). Whereas the Rule 12(b)(6) inquiry goes to the merits, the Rule 23(b)(3) issue is whether "law or fact questions common to the class predominate over questions affecting individual members." In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 32 (2d Cir. 2006). As the Supreme Court noted in Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, although

> a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 131 S. Ct. 2541, 2551 (2011), Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

133 S. Ct. 1184, 1194-95 (2013).

Therefore, Levitt's comment on Berwecky at most held that

6

Bear Stearns' alleged "control" of Baron was "sufficient to satisfy Rule 23(b)(3)'s predominance requirement." Levitt, 710 F.3d at 467 (citing Berwecky, 197 F.R.D. at 68-69).

Because Levitt is not in conflict with our summary order in Fezzani, the present panel did not overlook or misapprehend the law as is required for rehearing by F.R.A.P. 40(a)(2). We, therefore, reaffirm our holding that Bear Stearns' conduct as alleged in the Amended Complaint is not sufficient to state a claim for relief under Section 10(b) and Rule 10(b)(5). While the Amended Complaint alleges in conclusory fashion that Bear Stearns asserted "control" over Baron's trading activity, it fails to allege facts showing how this "control" related to fabricating "market" prices of particular securities and communicating them to customers or to manipulating prices with regard to any particular securities. Appellants allege that Bear Stearns was aware of the manipulations, knew that these manipulations were leading to a crisis, but continued to clear trades that did not involve unnecessary exposure to itself. Knowledge alone, however, is not enough to attach liability to a clearing broker under Section 10(b). ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007). Moreover, there are legitimate reasons for clearing brokers to monitor the trading activities of some introducing brokers. A clearing broker guarantees the performance of buyers and sellers of the

7

securities being traded and often extends credit to clearing brokers. Indeed, the complaint states that Baron was in deep debt to Bear Stearns, reason enough to monitor Baron's activities.

The facts alleged in the Amended Complaint, if proven, would not show that Bear Stearns directed the fraud or instructed Baron or Dweck[1] to set up sham transactions. There is a real danger of harm to the financial industry in allowing such allegations to suffice to subject clearing brokers to the cost of discovery and perhaps a trial even though there is no evidence of participation by the brokers in the fraud or manipulation. The potential of such litigation would deter clearing brokers from engaging in normal business activities -- guaranteeing performance, extending credit, and therefore often monitoring the financial condition of introducing brokers -- and drive up costs of trading generally. See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 163-64 (2008) ("extensive discovery and the potential for uncertainty and disruption in a lawsuit allow plaintiffs with weak claims to extort settlements from innocent companies," and because "contracting parties might find it necessary to protect against these threats, [this may] rais[e] the costs of doing

---

[1] Isaac R. Dweck is sued individually and as a custodian for Nathan Dweck, Barbara Dweck, Morris I. Dweck, Ralph I. Dweck, and Jack Dweck. Although appellants refer broadly to "the Dwecks," their allegations regarding the Dwecks seem to involve only Isaac R. Dweck.

8

business" and "[o]verseas firms . . . could be deterred from doing business" in United States security markets.). The complaint similarly alleges that Bear Stearns lent Baron money and propped it up, but this activity is integral to the ordinary clearing function of a clearing broker.[2] Finally, appellants fail to claim that Bear Stearns' alleged "control" was sufficient to render it a Section 20(a) control person with respect to Baron. The petition for panel rehearing with respect to Bear Stearns is, therefore, denied.

II.

We also address arguments, echoed in appellants' petition for rehearing, made in an amicus brief filed by the SEC. The SEC

---

[2] Appellants additionally argue that (1) they relied on Bear Stearns's confirmation statements in future purchases of stock; (2) the confirmations and monthly statements were themselves manipulative acts directed at plaintiffs; and (3) the panel overlooked binding state court precedent as to aiding and abetting liability. None of these arguments warrant rehearing.

Arguments (1) and (2) may be rejected because appellants have still failed to sufficiently allege conduct not involving the ordinary functions of a clearing broker, as discussed above.

Argument (3) -- regarding plaintiffs' state law claim of aiding and abetting fraud -- may also be easily dismissed. The District Court here dismissed that claim on the basis that "[a]s a matter of law, clearing brokers are not responsible or liable for the fraudulent sales practices of the introducing broker." Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410, 426 (S.D.N.Y. 2008) (citing Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 29 (2d Cir. 2000)). Although Judge Crotty relied on federal rather than state precedent, the Greenberg case's holding on this point is expressly as to New York state aiding and abetting liability. New York state law is not to the contrary, and we have recently reaffirmed exactly this principle. See In re Amaranth Natural Gas Commodities Litig., 730 F.3d 170, 185 (2d Cir. 2013) ("[T]he mere performance of routine clearing services cannot constitute the aiding and abetting of fraud under New York law." (emphasis added)); Levitt, 710 F.3d at 466 ("Not does the 'simple providing of normal clearing services to a primary broker who is acting in violation of the law . . . make out a case of aiding and abetting against the clearing broker.'" (quoting Greenberg, 220 F.3d at 29)).

9

incorrectly reads our opinion as holding that, in any and all

manipulation cases, liability attaches only to persons who

communicate a misrepresentation to a victim.  The SEC argues that

"[t]he essence of manipulation is not a misrepresentation, but

market activity -- the buying and selling of shares -- that

itself creates a 'false pricing signal.'  A manipulative

transaction, such as parking, is an 'intentional interference

with the free forces of supply and demand'" (quoting ATSI, 493

F.3d at 100; In re Pagel, Inc., 33 S.E.C. 1003, 1985 WL 548387,

*3 (1985), aff'd, 803 F.2d 942 (8th Cir. 1986)).  Arguing that

our opinion conflated manipulative conduct with

misrepresentations, the brief further states:

> This Court has similarly recognized that
> engaging in manipulative acts -- practices
> 'that are intended to mislead investors by
> artificially affecting market activity' --
> are violations distinct from making
> 'misrepresentations.'  Ganino v. Citizens
> Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).
> Emphasizing that distinction is this Court's
> ruling that a manipulation claim requires
> 'market activity aimed at deceiving investors
> as to how other market participants have
> valued a security.'  ATSI, 493 F.3d at 99-
> 100, 105 (emphasis added).

[Pet. Panel Rehear. 4]

We write only to state the obvious:  our opinion did not

require that reliance by a victim on direct oral or written

communications by a defendant must be shown in every manipulation

case.  Indeed, we agree with the propositions of law asserted by

10

the SEC that, in a manipulation claim, a showing of reliance may be based on "market activity" intended to mislead investors by sending "a false pricing signal to the market," upon which victims of the manipulation rely. ATSI, 493 F.3d at 100.

However, the discussion in ATSI of "false pricing signal[s] to the market" is derived from the Supreme Court's use of the efficient market hypothesis to establish a rebuttable presumption of reliance based on the effect of misrepresentations on the market price of securities. Basic Inc. v. Levinson, 485 U.S. 224, 241-45 (1988). ATSI extended a variation of that theory to market prices affected by manipulation. In the present case, however, there is no claim that there existed a market in any sense of the word for the shares Baron sold to appellants. The shares in question are not alleged to have been traded in any structure reasonably viewed as an independent  market with publicly reported prices purportedly representing arms-length transactions based on supply and demand. See ATSI, 493 F.3d at 100-01 & n.4. Therefore, there is not a claim that the inflated prices paid by appellants were based on "false pricing signal[s] to the market." The allegations in the present complaint state only that Baron sold shares to appellants at prices that were manufactured by Baron salespeople but were represented as set by trading in a market that was falsely represented to exist.

The appellants' and the SEC's concerns that our opinion

11

disregarded ATSI are, therefore, wholly unfounded.  Not only did our opinion cite ATSI repeatedly and quote extensively from it, but it read ATSI in a way favorable to manipulation claims.  Our opinion stated the "market" "signaled" by manipulative conduct need not be fully efficient -- a highly efficient market is an unlikely site for manipulation, see Fezzani v. Bear, Stearns & Co. Inc., 716 F.3d 18, 21 n.2 (2d Cir. 2013) -- and suggested that a future court might create a rebuttable presumption of reliance in a less-than-efficient market context.  See id.  What we did not, and could not, say was that ATSI's holding and rationale applies where no actual ongoing market for the securities in question exists.

Our point is illustrated by the claims against Dweck.  There is no allegation that Dweck's parking transactions, and their purported prices, were ever reported in a market.  Indeed, there is no allegation that the "prices" used in the parking transactions -- or in sham transactions by others coordinated with the parking -- were ever made known to the buyers of the securities in question or that the securities were sold to appellants at prices "signaled" by the prices used in the parking or coordinated transactions.  There are, in short, no factual allegations that Dweck's parking transactions sent "a signal" to any identified market or that any buyer or seller relied upon the parking prices.  In the entire 116-page complaint, appellants

12

have not specifically pleaded a causal link between any single stock purchase or sale and a corresponding parking by Dweck or coordinated transactions by others. See ATSI, 493 F.3d at 106-07.

Even though each of the individual plaintiffs must show reliance on a misrepresentation for which the particular defendant is responsible, there is no factual allegation by any of the eleven individual plaintiffs as to how the various "signals," "appearances," or "illusions" emphasized in the dissent as created by Dweck's parking moved the price they paid for particular shares. Much of the dissent turns on an attempt to confine the purposes of "parking" to avoiding downward pressure on a security's market price. But parking, a tactic that we agree can be a serious violation, can have many purposes. To establish this, we need look no further than the SEC's own description of Baron's frauds. Having found the lack of an independent market for the securities fraudulently sold by Baron, the SEC stated that "[w]hile persons may park stock for a variety of reasons[,] Baron parked stock to maintain the appearance of compliance with the commission's net capital rules." In re Bear, Sterns Secs. Corp., 705 S.E.C. 537, 1999 WL 569554, *3 n.6 (1999).

We do not reject the "signals" theory. Far from it. We simply recognize that it is a red herring given the nature of

13

appellants' claims. The pleading gaps described above are hardly unintentional. The complaint seeks damages from all defendants for all losses of all plaintiffs whether or not a particular defendant is alleged to have engaged in a sham transaction in a security purchased by a particular plaintiff. For example, appellants' claims against Dweck lump together sales of securities that Dweck did not park with those of securities he did park. Appellants claim that Dweck is liable for all of the losses of all of the plaintiffs whether or not the securities they bought were the subject of Dweck's parking transactions.[3] Clearly, ATSI's reference to false pricing signals to a market necessarily has to involve -- in private actions for damages -- allegations of: (i) particular securities (ii) manipulated by particular defendants (iii) causing the losses to the particular buyers. See ATSI, 493 F.3d at 101-02. Appellant claims fail to meet that requirement.

To sum up, the facts alleged in this complaint do not involve any ongoing market affected by false pricing signals by Dweck. What they involve are misrepresentations to the victims by Baron salespeople as to how the price they were charging for particular securities was arrived at. Dweck's role in parking

_____

[3] The complaint alleges on page 107 that Dweck is liable for losses in the "Manipulated Securities." Page 3 of the complaint defines "Manipulated Securities" to include several companies whose stock Dweck is not alleged to have parked or manipulated.

14

certain securities was unknown to, and not relied upon by, those who purchased identical securities, much less by those who purchased securities not parked by Dweck.  Although the complaint occasionally references an "inflated" market or "price movements," there is no allegation that customers relied on publicly reported prices[4] or anything other than the fraudulent representations of Baron salespeople. For all that appears in the complaint, the stock parking may have been intended to deceive regulators, as actually found by the SEC, 70 S.E.C. 537, 1999 WL 569554, *3-4, and perhaps Bear Stearns, but is not alleged to have caused particular transactions.  Our dissenting colleagues' discussion of market manipulation, while indisputable in the abstract, is used to create a theory of manipulation in the

---

[4] The SEC's amicus brief states, in a footnote, that "the Commission previously found, and as judicially noticeable material confirms (i.e., news items, trading records, and public filings) the relevant securities traded 'in over-the-counter markets' (i.e., NASDAQ) and on AMEX. In re Bear, Stearns Secs. Corp., 54 S.E.C. 224, 228 (1999)."  The citation has not led us to any SEC decision, much less one "finding" public trading of the securities in question.  What the footnote may be referencing is a 1999 SEC decision, see In re Bear, Stearns Secs. Corp., 70 S.E.C. 537, 1999 WL 569554, *2 (1999), that includes a cursory description of Baron's intended activities when it was founded in 1992: "Bressman and others established Baron in 1992 to underwrite the issuance of securities of small issuers trading in the over-the-counter markets, and to carry on market-making and retail sales of such securities." This description hardly suffices to remedy the lack of any allegations in the complaint that transactions in the relevant securities and their pricing were publicly available or that the prices communicated by Baron salespeople were in any way related to publicly reported prices.  Finally, and dispositively, even if publicly reported transactions with a connection to sales by Baron were alleged, they would not support the claims asserted in the complaint, which seeks to hold all defendants liable for all of the plaintiffs' losses. The suggestion that we take judicial notice of various unidentified documents that may or may not show public trades seems rather anomalous in light of the failure of the 116-page complaint to mention them and of the amicus brief's failure to provide detail.  In any event, even if we discovered some public trading, that would not remedy the other problems described above.

absence of a market.

Given these facts, Stoneridge clearly applies to the claims against Dweck. There is no presumption of reliance based on any identifiable market, and -- given the lack of an allegation that any plaintiff knew of the stock parking or prices used therein -- no allegation of reliance upon the parking transactions. See Stoneridge, 552 U.S. at 159-60.

Finally, as we noted in our opinion, although claiming that defendants are liable for all losses of all investors caused by Baron, whether or not the losses involved sham transactions by a particular defendant, appellants have never offered either a theory of vicarious liability under state law or of controlling-person liability under federal law. The SEC's amicus brief fails even to purport to fill this gap.

LOHIER, Circuit Judge, concurring in part and dissenting in part:

The majority opinion today denies a petition for rehearing that I would have granted in part. I nevertheless commend my panel colleagues for clarifying that the initial majority opinion in this case did not hold that the Supreme Court's decisions in Stoneridge and Janus[1] require a plaintiff claiming market manipulation to allege that a defendant directly communicated false information to a victim. Majority Op. at 10–11. Because that opinion initially appeared to foreclose the plaintiffs' market manipulation claim against Israel Dweck, even though plaintiffs alleged that he had engaged directly in a manipulation of securities, I dissented on the ground that the opinion conflated the elements of a misrepresentation claim and those of a manipulation claim. In particular, it appeared to ignore the well-established theory of reliance based on the fraud-on-the-market doctrine. See Fezzani v. Bear, Stearns & Co. Inc., 716 F.3d 18, 29 (2d Cir. 2013) (Lohier, J., dissenting). As the Supreme Court recently reaffirmed, that doctrine remains alive and well. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2409, 2413–15 (2014).

---

[1] Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008); Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011).

1

Prompted in part by the compelling arguments advanced by the Securities and Exchange Commission as amicus curiae in support of the appellants' petition for rehearing, the majority's denial of the petition helpfully corrects the misimpressions left by the original majority opinion. For example, it recognizes that we have never required "that reliance by a victim on direct oral or written communications by a defendant must be shown in every manipulation case."[2] Majority Op. at 10–11. It also clarifies that "in a manipulation claim, a showing of reliance may be based on 'market activity' intended to mislead investors by sending 'a false pricing signal to the market,' upon which victims of the manipulation rely." Id. at 11. Of course, I agree; as I explained in my prior dissent, to read our jurisprudence otherwise would be a mistake. See Fezzani, 716 F.3d at 28–29 (Lohier, J., dissenting).

Nevertheless, I continue to dissent from the majority's ongoing refusal to let the plaintiffs' claims against Dweck proceed. We should grant the petition for rehearing and vacate the District Court's dismissal of those claims. The majority opinion's denial of the petition is wrong because, in the process of correcting one

---

[2] Here, I would replace the phrase "every manipulation case" with "any manipulation case."

apparent error in the original opinion, it falls prey to two others.

The opinion's first error is to suggest that the claims against Dweck founder because they "lump together sales of [manipulated] securities that Dweck did not park with those of securities he did park," even though the plaintiffs also allege that Dweck is responsible for losses in both categories of securities. Majority Op. at 13. This is not a reason to dismiss these claims. As an initial matter, the plaintiffs' treatment of the parked and unparked securities together does not justify dismissing the complaint as to those securities that Dweck is alleged to have parked. More importantly, the opinion ignores the fact that the alleged manipulative scheme here, like most "pump and dump" stock manipulation schemes, involves a cluster of interdependent securities that the defendants—Dweck included—manipulated in tandem by parking certain shares of those securities with knowing nominees while selling other shares to unwitting victims. As the complaint describes it, "[i]f one security propped up by the misconduct of defendants failed, all would fail." J.A., Vol. II, at 255. In other words, Dweck's parking of certain securities helped to sustain the defendants' manipulation of all of the securities, and the allegations in the complaint as to Dweck's role in the manipulation support a claim for losses

3

associated with the overall market manipulation scheme.

The opinion makes a second, more serious set of errors. It misunderstands the relationship between parking transactions and the fraud-on-the-market doctrine, and it confuses the "signals" theory relating to parking transactions—a theory the opinion purports to embrace, see Majority Op. at 13—with the direct misrepresentation theory. In unraveling these errors, I think it useful to define "parking," which, in the context of market manipulation, is no mere infraction; people go to prison for it. See, e.g., United States v. Russo, 74 F.3d 1383, 1386, 1393 (2d Cir. 1996); United States v. Regan, 937 F.2d 823, 829–30 (2d Cir.), amended by 946 F.2d 188 (2d Cir. 1991). We have described "parking" as follows: "[A]n artificial device to avoid depressing the market price [that] . . . occurs when a broker, unable to keep securities in his trading account, ostensibly sells the same to another broker, with the understanding that the same securities will be purchased back by the ostensible seller before the settlement date. In this manner the shares are not sold into the [open] market." United States v. Corr, 543 F.2d 1042, 1045 n.5 (2d Cir. 1976); see also United States v. Bilzerian, 926 F.2d 1285, 1290 (2d Cir. 1991) ("'Parking' refers to a transaction in which a broker-dealer buys stock from a customer with the understanding that the

4

customer will buy the stock back at a later date for the purchase price plus interest and commissions . . . [with] no market risk to the broker-dealer who is the owner of the shares in name only.").  An illegal parking transaction keeps a significant number of shares in the hands of a "friendly" nominee who agrees not to sell the security and thereby avoids placing downward pressure on the share price, as might occur if the security were sold legitimately on the open market.  In turn, keeping the parked shares out of the market supply enables the defendant to maintain better control over the tradeable shares and to manipulate the share price more easily.

So defined, parking indisputably reflects an illegal sham transaction, an artificial device designed to avoid depressing the market price of a security.  We previously have recognized the tie between parking transactions and a fraud on the market.  See Russo, 74 F.3d at 1393 (endorsing a theory pursuant to which a broker-dealer for whom defendants worked engaged in stock parking and thereby "perpetrated a fraud on the market by divorcing the financial risk of owning [the parked stock] from legal ownership of the stock").  Commentators have confirmed the connection.  See, e.g., Lewis D. Lowenfels & Alan R. Bromberg, Securities Market Manipulations: An Examination and Analysis of

*Domination and Control, Frontrunning, and Parking*, 55 Alb. L. Rev. 293, 339–41 (1991).

The majority opinion does not quibble with the fact that the complaint alleges a parking transaction more or less as defined above. Instead, it derides the complaint for not alleging that the specific prices used in Dweck's parking transactions "were ever reported in a market" or that the "'prices' used in the parking transactions . . . were ever made known to the buyers of the securities in question or that the securities were sold to appellants at prices 'signaled' by the prices used in the parking . . . transactions." Majority Op. at 12. But this misunderstands one of the primary functions of parking schemes such as the one alleged here: to conceal rather than transmit real price information. Here, the relevant "signals" are not false pricing signals about the specific "prices used in the parking transactions," but rather include: (1) creating the false appearance of trading volume or activity in the parked security, (2) making it appear that Dweck (and others) rather than the broker-dealer was the beneficial owner of the security who bore the financial risk of ownership, when, in fact, Dweck's financial risk as a nominal holder of the securities was divorced from his legal ownership, (3) masking the number of shares of the manipulated securities that

the broker-dealer actually controlled, and (4) creating the illusion that the parked securities were trading on the open, liquid market, when in fact they were not. In my view, several paragraphs in the complaint plausibly allege that these signals, among others, were transmitted to the market. For example:

> 10. Defendant[] Isaac R. Dweck . . . also engaged in parking transactions with the purpose and effect of creating a false appearance of an active trading market with the intent of inflating the trading price of the Manipulated Securities and causing investors, such as plaintiffs to purchase the Manipulated Securities.

> 131. Parking misl[ed] regulators and customers about the amount of Baron Stocks in Baron's own inventory, and fictitiously improved Baron's net capital . . . . The placement of such stock also artificially maintained the price of the Manipulated Stocks. The "parking" was done with the purpose and had the effect of creating a false impression in the minds of Baron customers of the value and liquidity of the "parked" securities and induced Baron customers, including plaintiffs, to make investments based on Baron's illusion of trading activity.

> 221. . . . [Plaintiffs] were unaware that the market for Baron stocks was entirely a fictional mirage. Month after month, they had received confirmations and monthly statements from Bear Stearns which indicated that the Baron stocks were trading in a bona fide market. Publicly available information on these stocks further confirmed an active market where large numbers of shares traded freely. . . . [None of the]

7

plaintiffs[] knew that Bear Stearns, the Dweck Defendants, . . . and all other defendants knew that Baron simply cr[e]ated the illusion of an active market through parking, wash sales, unauthorized purchases and fraud.

319. . . . Defendants' fraudulent and manipulative activities as described herein created the appearance that the price at which the Manipulated Securities traded reflected <u>bona fide</u> supply and demand in a freely functioning market. The increasing prices of the Manipulated Securities appeared to indicate increasing value, placed by the market, on the businesses underlying the securities. Thus, . . . the appearance of an active, rising market induced plaintiffs to purchase those securities in reliance upon the "wisdom of the marketplace." Instead, the values placed by the market on the Manipulated Securities were fictitious and solely a result of defendants' manipulative practices.

J.A., Vol. II, at 243, 281, 310, 340.

The majority opinion summarizes its reasons for denying the petition by suggesting that the plaintiffs did not rely on the signals conveyed by Dweck's parking transactions, but relied instead on "misrepresentations by Baron sales people as to how the price they were charging for particular securities was arrived at." Majority Op. at 14. The opinion concludes that "Dweck's role in parking certain securities was unknown to and not relied upon by those who purchased" the securities. <u>Id.</u> On the one hand, to the extent that the majority

8

opinion can be understood to conclude that the plaintiffs failed to allege reliance on Dweck's role, it misses the point of the manipulative scheme, which was to conceal rather than disclose Dweck's role as a confederate who parked securities. On the other hand, to the extent that the opinion suggests that the plaintiffs inadequately alleged reliance on the effect of Dweck's parking, as well as other components of the manipulative scheme, that suggestion is contradicted by the allegations quoted above.

I can't help but to end by noting that the majority opinion trots out Stoneridge yet again to reject the claims against Dweck, this time on the ground that the plaintiffs did not allege "reliance upon the parking transactions." Majority Op. at 15. I have previously explained and will not repeat why Stoneridge does not apply to claims of market manipulation such as the one alleged here, or why plaintiffs were not obliged to allege reliance on the parking transactions themselves.

I respectfully dissent from the denial of the petition for rehearing as to the

claims against Dweck.[3]

---

[3] The appellants' arguments in their petition for rehearing relating to Bear Stearns and the summary order in this case are not without force. Nevertheless, I agree with my panel colleagues that the appellants' nearly exclusive reliance on Levitt v. J.P. Morgan Securities, Inc., 710 F.3d 454 (2d Cir. 2013), is misplaced. Levitt is not necessarily inconsistent with the summary order and, as a technical matter, fails to provide a basis for rehearing under Rule 40(a) of the Federal Rules of Appellate Procedure. I therefore concur in the result as to Bear Stearns. I do not necessarily join the majority's other reasons for rejecting the petition for rehearing as to Bear Stearns. See, e.g., Majority Op. at 8 ("There is a real danger of harm to the financial industry in allowing such allegations to suffice to subject clearing brokers to the cost of discovery and perhaps a trial even though there is no evidence of participation by the brokers in the fraud or manipulation.").